<u>WARNING:</u>    <u>THIS DOCUMENT IS SEALED AND CONTAINS NON-PUBLIC INFORMATION</u>

ELLIOT ENOKI #1528
Acting United States Attorney
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
*May 26, 2017*
SUE BEITIA, CLERK

MARC A. WALLENSTEIN #10456
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850
Telephone:   (808) 541-2850
Facsimile:   (808) 541-2958
E-mail: Marc.Wallenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF SILVER LEXUS SEDAN, LICENSE PLATE NUMBER SRN395, VIN # JTHCK262X72011015 | Case No. 16-1227 BMK<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Stephen B. Biggs, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the

installation and monitoring of a tracking device on a silver Lexus 4-door sedan

bearing license plate number SRN395 and vehicle identification number

JTHCK262X72011015 ("SUBJECT VEHICLE"). Based on the facts set forth in this

affidavit, I believe that the SUBJECT VEHICLE is currently being used in

furtherance of violations of 18 U.S.C. § 2339B (Providing material support to foreign

terrorist organizations); 18 U.S.C. § 1113 (Attempt to commit murder within the

special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1114

(Attempt to kill any officer or employee of the United States); and 18 U.S.C. § 115

(Threatening a federal official); and that there is probable cause to believe that the

installation of a tracking device on the SUBJECT VEHICLE and use of the tracking

device will lead to evidence, fruits, and instrumentalities of the aforementioned

crimes, as well as to the identification of individuals who are engaged in the

commission of those and related crimes.

2.     I am a Special Agent of the Naval Criminal Investigative Service

("NCIS") and have been since January 2008.  I am currently assigned to the NCIS

Hawaii Field Office located in Honolulu, Hawaii.

3.     Since 2014, I have been assigned as a Task Force Officer to the Federal

Bureau of Investigation, Honolulu Division, Joint Terrorism Task Force.  My

responsibilities as an FBI Task Force Officer include but are not limited to the

investigation of domestic and international terrorism matters with a nexus to the U.S.

Department of Defense.  As an FBI Task Force Officer, I have utilized court-

authorized search warrants, conducted physical surveillance, utilized confidential informants, interviewed subjects and witnesses during domestic and international terrorism investigations.  As an FBI Task Force Officer, I have interviewed witnesses, executed court-authorized search warrants, and used other investigative techniques to determine the methods used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. As an FBI Task Force Officer, I have received advanced training on the conduct of international terrorism investigations, maritime counterterrorism operations and investigations, and counterterrorism online investigations.  I was previously assigned to the NCIS Southeast Field Office as a member of the South Florida High Intensity Drug Trafficking Area Task Force.  Because of my training and experience as an NCIS Special Agent, I am familiar with United States Criminal Code and the Uniform Code of Military Justice.  In past investigations, I have used court-authorized search warrants for the installation of tracking devices on vehicles to assist physical surveillance, determine patterns of life, and observe criminal activity.  In past criminal investigations, I have executed search warrants that resulted in valuable physical and digital evidence collection, seized assets, and numerous subjects agreeing to cooperate with the government.  I have completed basic and advanced law enforcement training courses at the Federal Law Enforcement Training Center at Brunswick, GA and at the Federal Bureau of Investigation Training Academy at Quantico, VA.

4.      My experience as an NCIS Special Agent and FBI Task Force Officer

includes, but is not limited to, counterterrorism matters, investigations of drug trafficking organizations, the sale of illegal firearms, and the distribution of firearms by prohibited persons. I am experienced in physical surveillance, interviews of witnesses, the use of search warrants, and the use of confidential informants.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

7.      On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan

Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

8.      U.S. Army Staff Sergeant Ikaika Erik Kang ("KANG") is trained as an air traffic controller. KANG is assigned to the 25th Infantry Division, Combat Aviation Brigade. In August 2016, a Confidential Source ("CS1") observed KANG watching videos at KANG's residence, 94-542 Kupuohi St. #204, Waipahu, Hawaii. KANG invited CS1 into his room and told him the videos depicted ISIL fighters. KANG was excited to share the videos with CS1. KANG told CS1 that he admired suicide bombers and their sacrifice, describing them as fearless. KANG showed CS1 such videos three times in August 2016 and twice in September 2016.

9.      CS1 remembered one video that depicted a row of men in a warehouse hanging upside down by shackles around their ankles. An ISIL member walked by and cut off their heads. Another video depicted what appeared to be a child soldier with a gun, killing a row of men. CS1 relayed that KANG was especially excited to show CS1 a beheading video of a row of men kneeling while having their heads cut off. In my training and experience, beheadings of this nature are a common execution method used by ISIL. In my training and experience, it is common for ISIL to produce videos of this nature as propaganda to recruit followers to further its cause, including by committing acts of violence. CS1 remembered feeling sick to his stomach, while KANG laughed and insulted the victims.

10.    CS1 described KANG as "obsessed" with the videos, which are of beheadings, shootings, suicide bombings, fighting, and other ISIL violence. CS1 said that KANG watches these videos approximately four to five hours each day during the week, and probably more on the weekends.

11.    During the first week of September 2016, CS1 recalled KANG telling him that if he were to do something like shoot up a large gathering, it would be out of his hatred for white people, the wicked, and non-Muslims. KANG further stated that it "would be for the cause." In my training and experience, KANG's comment about acting "for the cause" means committing an act of violence on behalf of ISIL.

12.    On or about the first or second week of September 2016, at KANG's residence after KANG had returned home from work, CS1 observed that KANG was angry. CS1 asked KANG how his day was, and KANG told CS1 that he had discussed ISIL with a fellow soldier who supported ISIL's mission to fight common enemies of the United States, but did not support ISIL's general mission and violence. KANG told CS1 that he was angry because the fellow soldier "had no idea" and deserved to die because he "didn't understand." KANG told CS1 that he wanted to go back to work and shoot him. CS1 suggested KANG might get arrested and maybe just beating him up was a better alternative, and KANG laughed and said "Nope, I just want to end him."

13.     On or about the last week in September 2016, KANG discussed with CS1 shootings at a shopping mall that had killed six people.[1] KANG told CS1 that if KANG were to have done it, KANG would have killed a lot more people because he could get more shots off, and he would have waited until they were all gathered together. KANG told CS1 that if the movie "The Purge" were real, he would pick up an "asshole military guy," toss a grenade at him, and blow him up.[2] KANG later told CS1 that he does not have any friends, but if he had a group of friends, they would be like KANG and would go out killing people.

14.     CS1 is aware that KANG has a firearm in a safe in KANG's closet. Based on CS1's interactions with KANG, CS1 is afraid for his safety when around KANG, specifically, he is afraid because he does not want to become "victim number 1."

15.     Review of state firearms registration records by the FBI shows that KANG is the registered owner of two firearms, including a .40 Caliber Smith & Wesson M&P handgun and an 5.56mm Smith & Wesson M&P15 (AR-15 style) rifle.

---

[1] Your affiant believes this incident is actually referring to an attack at a shopping mall in St. Cloud, Minnesota on September 17, 2016, during which a lone attacker stabbed 10 people with steak knives, causing serious injury. The attacker was killed by law enforcement.

[2] "The Purge" is an American dystopian horror film-series that is about a 12-hour period each year, during which all crime is legal and all emergency services are unavailable. The film series depicts widespread, notably graphic violence and murder.

16.     Another individual, CS2, who works with KANG, noticed an increase in KANG's discussions of radical Islam during the beginning of September 2016.  CS2 has heard KANG talk about religion, anti-government topics, and ISIL.  On one occasion, when CS2 and KANG were in the car together, KANG was playing an audio recording of an Arabic speaker through the car stereo using his cellular telephone.  When CS2 asked KANG what he was listening to, KANG stated that he was listening to a prophet reciting the Quran.  KANG further stated that the speaker had been killed in the early 2000's, but KANG could not remember if he had been killed by a bomb or was a suicide bomber.

17.     CS1 asked KANG what had been happening with the war overseas, and KANG told CS1 that ISIL was fighting a "holy war."  CS1 inquired if KANG would join ISIL if asked, to which KANG responded "Yeah, hell yes!"  Kang said that his plan was to stay in the military long enough to get promoted to E7,[3] and then he would separate from the military, move to the Middle East, join ISIL, become a Muslim, study Arabic, and follow the Quran.  KANG was excited about going to the Middle East to "join the cause."  KANG said that he was "only in the military for a paycheck."  KANG explained that he began researching the Muslim religion in 2014 and had continued studying over the past year.

---

[3] "E7" is an enlisted rank in the military.  In the U.S. Army, E7 is a Sergeant First Class.

18.    KANG told CS1 that, if KANG became a member of ISIL, he would be a suicide bomber and would attack Schofield Barracks on Oahu, Hawaii. Based on my training and experience, individuals who plan to conduct such attacks tend to use motor vehicles in furtherance of such attacks, including to plan the attack, and to move into location to conduct the attack.

19.    KANG showed CS1 the website, www.jihadology.net. In my training and experience, jihadology.net serves as both an academic site for jihadi source material and promotes a violent interpretation of Islam, and is often used for research by individuals who later self-radicalize and attempt to conduct violence in the name of radical Islam. CS1 said that KANG seemed to be absorbing the information about ISIL, "like a sponge."

20.    KANG made additional statements in support of ISIL, including in December 2016, when KANG told fellow soldiers that if he deployed to Iraq, he would not shoot back at ISIS, and as recently as January 6, 2017, when he told fellow soldiers that if the government went to war over fake news or without proof, that we are terrorists. On or about January 10, 2017, KANG received negative counseling for making these statements from his chain of command. He was advised that the statements described in this paragraph may be punishable as disloyal statements under Article 134 of the U.C.M.J.

21.    KANG has continued making troubling statements despite being counseled. On February 14, 2017, one of KANG's supervisors asked KANG, in

9

reference to his previous negative counseling, whether he was keeping his personal political beliefs to himself. KANG responded that his soldiers "need to understand" and expressed his desire to share his beliefs with his subordinates, because he wanted his soldiers to be informed in case there was a takeover. When asked whether KANG had any friends or hobbies, or if he does anything on the weekends, KANG responded that he only does research and studies "the truth" on the weekends, such as the unconstitutional war in Iraq. KANG stated that he had previously been at a point in his life where he felt so overwhelmed by his knowledge of "the truth" that he thought about martyrdom, and that he did not care if he went to jail because of what he knew. When asked if he still felt that way, he replied that he did not.

22.     KANG continues to make statements in support of ISIL, including on the morning of March 16, 2017. KANG was engaged in loud conversations with fellow soldiers while on a military base, criticizing the coalition's efforts against ISIL and specifically calling them "a media campaign"; additionally, KANG asserted that the terrorist attacks on September 11, 2001, were an inside job conducted by the U.S. government to instigate a war in the middle east. KANG's military superior instructed KANG and other soldiers to cease the conversation and focus on their work, but KANG instead continued with the conversations. On or about March 29, 2017, KANG received negative military counseling for making these statements. He was advised that his failure to obey the military order to stop

the conversations may be punishable as an orders violation under the Uniform Code of Military Justice.

23. Based on my training an experience, it is critically important that the FBI continue monitoring KANG's activities and whereabouts closely, now that he has been more formally confronted with his support of ISIL by the military, and has nevertheless continued to make similar statements. Based on my training and experience, KANG may develop a grievance against the military or the U.S. Government based on the negative counseling that he received and the follow-up that took place on February 14, 2017 and March 29, 2017. Based on my training and experience, I discredit KANG's statement that he is no longer considering martyrdom.

24. On May 19, 2017 the 25th Combat Aviation Brigade (25th CAB) JAG personnel expressed their concern to the FBI over their ability to monitor KANG'S whereabouts. KANG returns from leave on May 25th, 2017 which is the same day as the 25th CAB's Change of Command ceremony. The 25th CAB personnel stated that the ceremony would be a large gathering of people and represented a target of opportunity for KANG should he want to harm members of the unit. In an effort to monitor KANG on May 25th, 2017 the Provost Marshall has assigned two patrols in addition to the surveillance assets who have been regularly assigned to KANG.

25. The FBI investigation into KANG's activities is ongoing. The FBI is continuing its efforts to detect and disrupt KANG's possibly unlawful and violent activities. Based on my knowledge, training and experience, along with frequent

11

communication with other law enforcement personnel, individuals like KANG who are involved in the visualizing and planning stage of committing a violent act often use vehicles to travel to the locations they plan to conduct an attack or act of violence, and take photos or videos there. It is critical that the FBI is able to continue tracking KANG's vehicle.

26.    Based on the foregoing, there is probable cause to believe that the installation of a tracking device on the SUBJECT VEHICLE and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those and related crimes. KANG is the registered owner of two firearms, one of which is an AR-15 rifle. KANG can use the SUBJECT VEHICLE to transport his firearms to and from his workplace, which is on a military base. KANG can use the SUBJECT VEHICLE to store and conceal his firearms while he is at work, which would enable him to prepare for and conduct a violent attack against military personnel at a time and place of his choosing in violation of 18 U.S.C. § 1113 (Attempt to commit murder within the special maritime and territorial jurisdiction of the United States) and 18 U.S.C. § 1114 (Attempt to kill any officer or employee of the United States). The SUBJECT VEHICLE is therefore an instrumentality of the aforementioned crimes, and there is probable cause to believe that the installation of a tracking device on the SUBJECT VEHICLE will lead to evidence of the aforementioned crimes.

27.     More basically, KANG's whereabouts constitute evidence of the aforementioned crimes, and the tracking device will allow (and is necessary for) law enforcement to know his whereabouts continuously. The FBI is currently engaging in covert visual surveillance of KANG, in coordination with military law enforcement authorities, including Army CID. That joint surveillance effort requires a handoff whenever KANG enters and leaves a military base, because KANG lives off-post but works on-post. A tracking warrant is necessary to preserve the continuity and integrity of that covert surveillance, because there is a point between when KANG enters base and arrives at his command, where surveillance is gapped. The FBI uses civilian FBI agents in plain clothes and unmarked, civilian vehicles to observe KANG. Based on my training and experience, it would risk revealing to KANG that he is under surveillance for the FBI to, for example, follow KANG on-post, park within sight of his workplace in an unfamiliar civilian vehicle, and continuously observe him throughout the workday. Instead, military law enforcement, including Army CID, are tasked with monitoring him while he is on-post. In my training and experience, it is far less suspicious for military law enforcement to operate on a military post than it is for the FBI to operate on a military post. Based on my training and experience, if KANG were to become aware of the ongoing surveillance, he is likely to conceal or destroy evidence, alter his behavior to avoid detection, or react violently. A tracking warrant is therefore necessary to enable law enforcement to

continuously observe KANG while also preventing KANG from becoming aware of the surveillance, which in turn would likely lead to the destruction of evidence.

28.     Based on the observations of other agents who have seen the subject vehicle, as well as a search of the Department of Motor Vehicle ("DMV") database, I know that the SUBJECT VEHICLE is currently registered within the District of Hawaii, and is owned by KANG.

29.     In order to track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device on the SUBJECT VEHICLE while it is in the District of Hawaii. Because KANG sometimes parks the SUBJECT VEHICLE in driveways and on other private property, it may be necessary to enter onto private property and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking device.  I seek authorization to do so at or around KANG's residence, 94-542 Kupuohi St. #204, and at or around KANG's workplace, 1550 Santos Dumont Ave, Wheeler AAF, Hawaii 96854, because law enforcement officers have observed KANG's vehicle parked at these locations recently.

30.     To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours.  As described above, KANG possesses two firearms and has expressed a desire to kill people, including military service members.  Law enforcement has observed

14

KANG's vehicle parked in a location visible from KANG's residence during daylight hours, which would be less visible from KANG's residence during nighttime hours.

31.     In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

**AUTHORIZATION REQUEST**

32.     Based on the foregoing, I request that the Court issue the proposed search warrant extension, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the FBI or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install and continue to use a tracking device on the SUBJECT VEHICLE within the District of Hawaii within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; to surreptitiously enter at or around KANG's residence, 94-542 Kupuohi St. #204, and at or around KANG's workplace, 1550 Santos Dumont Ave, Wheeler AAF, Hawaii 96854, and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking

15

device; and to monitor the tracking device for a period of 45 days following April 15, 2017, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Hawaii.

33.    In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 120 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

34.    I further request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain

to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

Stephen B. Biggs
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on____May 26,2017____, 2017.



Barry M. Kurren
United States Magistrate Judge

17